LIZZIE H. LEITHOFF et al., executors, &c.,

*v.*

JOHN DENNIS et al.

[Decided June 27th, 1916.]

1. An attorney who occasionally collected the interest on mortgages left in his office, and advised the owners regarding other loans, *Held* unauthorized to sell them.

2. An owner of mortgages does not lose title to them by a forged assignment.

3. The deposit of mortgages with an attorney of good professional and business standing is not negligence, and does not estop the owners from attacking his fraudulent assignment of them.

4. Where an attorney prepared an assignment of certain mortgages belonging to his clients and attached to it a sheet bearing the clients' signatures, which he obtained in some unexplained manner, the clients were not estopped by the attorney's possession of their signatures from attacking the assignment.

On final hearing on bill, answer, replication and proofs.

*Mr. Francis Child, Jr.,* for the complainants.

*Mr. Francis Lafferty,* for the defendant John Dennis.

*Mr. Archibald F. Slingerland* and *Mr. Conover English,* for the Liberty Trust Company.

*Mr. Edwards T. Casebolt,* for the defendant Alice Macknet.

HOWELL, V. C.

The bill in this case is filed for the purpose of setting aside a certain alleged assignment or transfer of eight mortgages belonging to the complainants; such supposed transfer having been made to the defendant John Dennis. The facts are that prior to August 25th, 1911, the complainants, in the capacity of executors of and trustees under the last will of August Loehnberg, had in their possession a large number of bonds and mortgages which they held as investments of the funds of the estate. During the lifetime of James M. C. Morrow, a solicitor of this court, who died in 1906, the executors were accustomed to retain his services to superintend the mortgage loans made by them. At that time one Roland D. Crocker, a solicitor of this court, was a clerk in the office of Mr. Morrow, and apparently had more or less to do with the business of the executors. Mr. Morrow was a man of unblemished reputation and in every way worthy of the confidence of the executors. They, reposing confidence in him, kept their investment mortgages in one of his safes. This course of conduct was continued down to the death of Mr. Morrow, at which time Crocker succeeded as supervisor of the loans made by the estate. From 1906 down to 1914, when Crocker disappeared, he was called upon to examine a small number of loans. The mortgages, however, remained in the same safe in which Mr. Morrow had previously kept them, and access to them was openly and freely had by Crocker down to the time he made his disappearance. It appears that occasionally Crocker collected interest on some of the estate mortgages

and paid it over ·to Mr. Schwartzwaelder, who kept the estate account.

I have examined the testimony carefully for evidence that Crocker was in some way or to some extent the agent of the complainants, but nowhere do I find any evidence that he was the general agent of the complainants to buy, sell and deal in and transfer and assign mortgages which they had taken as investments; nor is there any evidence that he was specially authorized by the executors, either expressly or by implication, to sell or offer for sale the several mortgages which are the basis of this litigation. The final disposition of this case seems to me to turn on the question of agency or no agency. If Crocker can be said to have been the complainants' agent, and to have acted within his authority in doing what he is charged with having done, then the case must be quickly decided against the complainants. If, however, I come to the conclusion that there was no such agency, then the thing that Crocker did was to commit the crime of forgery, an act falling beyond the scope of any agency.

The pertinent facts of the case are as follows: Doctor Dennis had about $25,000 to invest; he applied to Mr. Poole, who had previously acted as his legal adviser. Mr. Poole and Crocker had offices in the same suite, although they were not connected together in business. A few days later Mr. Poole informed the doctor that he had found some mortgages and he·produced a list of several which he said belonged to the Loehnberg estate, and that the Loehnberg estate had to dispose of them because it needed the money to pay off some of the heirs. The doctor went with Mr. Poole and examined all the properties, nine in number, on which these mortgages were liens, and in conclusion decided that he would purchase the mortgages. They were all embodied in a typewritten assignment, which was prepared by Crocker, and bears date the 24th day of August, 1911; its execution was apparently acknowledged before Crocker on August 26th, 1911, and it was recorded in the office of the register of deeds of Essex county on September 20th, 1911, in Book 101 of Assignments of Mortgages, pages 44 and·45. The document contains at the end the signatures of the complainants; they

appear to have been witnessed by Crocker. The complainants had no knowledge of any of the transactions complained of until after Crocker disappeared in the fall of 1914. The complainants admit the genuineness of their signatures to the document in question; they say that they undoubtedly signed the sheet with their own hands, but they likewise say that it was not for the purpose of assigning the nine mortgages mentioned therein, but for some other purpose at present unknown to them, and that after their signatures had been written, as they appear to be written on the fourth sheet of the instrument in question, some-one, and, presumably, Crocker, took the former document apart and inserted three new sheets, being the three top sheets, and put the paper together again. It is quite apparent, upon a close examination of the instrument in question, that at some time or other in its history it has been tampered with. The first three sheets were not written on the same typewriting machine as was the last sheet; that is apparent upon the most cursory examination of the paper and comparison of the sheets. The typewriting on the fourth sheet was done on a machine whose types were very much worn, particularly were they worn at the bottom of the line. The paper on which the three top sheets were written seems to be of a different texture from that on which the fourth sheet was written; the marginal rulings are not all the same width, and by turning over the top fold through which the eyelets are placed, the duplicate holes in the last sheet may be seen, showing that the last sheet had probably at some time or other composed a portion of another document. A day was fixed for closing the transaction, and it was closed on that day at Poole's office. Dennis paid the money, $24,900, and received the assignment, apparently in the form in which it now is, which was sent by Poole to be recorded and was received by him from the record office when it was finished, and was delivered by him subsequently to Doctor Dennis, who produced it at the hearing and in whose possession he testifies it has always been. With the assignment in question there was delivered to Dr. Dennis the mortgages upon which the supposed assignment operated, and these the doctor says remained in his possession until some of them were sold or assigned, and that those which were not so

sold or assigned are in his possession still and were produced by him at the hearing. All this transaction took place without any knowledge or intimation on the part of the complainants; so far as they were concerned, they had left their mortgages in Crocker's safe and rested in full security upon the deposit thus made. The question is whether they must lose their mortgages because of the fraud committed by someone else, of which they had no knowledge and to which they made no contribution.

It is thoroughly well settled, requiring no citation of authorities, that one cannot be deprived of the title and ownership of his property by forgery, theft or other fraud to which he has not in any way contributed. Sometimes one may by his negligence be found to be a contributor to his own undoing, and it is alleged, on the part of one of the defendants in this case, that that principle applies to the complainants here; they say that it was negligent on the part of the complainants to leave their bonds and mortgages in the possession of anyone who might use them for his own ulterior purposes. I do not think that this defence can prevail. I see no negligence in an investor leaving his investment securities in the hands of a third person, nor can there be any presumption or inference of that kind of negligence from the fact that he leaves his mortgage securities with his attorney. It appears in this case that up to the time of his disappearance Crocker had enjoyed an unblemished reputation; that he was a lawyer in good standing at the bar, and that he was chairman of the executive committee, and the leading member thereof, of the Liberty Trust Company, a New Jersey corporation, carrying on the business of a trust company in the city of Newark. It is a very common thing for people to deposit their bonds and mortgages, and other documents quite as important, such as wills, contracts, title deeds and other valuable papers, with their attorneys. I do not think that this fact shifts the burden of proof, or permits the inference to be made that the complainants have themselves contributed to the loss.

Now, taking up the instrument itself, it purports to assign nine mortgages which are designated in the case by the following names: (1) Hughes, $5,000; (2) Iwers, $2,000; (3) Iwers, $500; (4) Newman, $9,000; (5) Newman, $600; (6)

Heineman, $1,000; (7) Hunkels, $3,000; (8) Bock, $2,400; (9) Murray, $3,000. The testimony shows that the Murray mortgage had been paid off before the Dennis assignment was made, leaving eight mortgages which were supposed to have been covered by the assignment.

Another assignment now turns up, of which we have only a certified copy from the record in the office of the register of deeds, which purports to have been made by the complainants to the said John Dennis, by which six mortgages were assigned to him, viz., (1) Hughes, $5,000; (2) Iwers, $2,000; (3) Iwers, $500; (4) Newman, $9,000; (5) Newman, $600; (6) Heineman, $1,000. This assignment purports to have been made on August 25th, 1911, to have been acknowledged on August 26th, 1911, and to have been recorded on September 20th, 1911. These three dates corresponding with similar dates of the first assignment above referred to, which I shall call the nine-mortgage assignment. It was, evidently, the purpose of the perpetrator of all these frauds to substitute on the record the six-mortgage assignment in the place of the nine-mortgage assignment, because the nine-mortgage assignment does not appear ever to have been recorded.

Still another assignment turns up, purporting to have been made by the complainants to Doctor Dennis. This bears date September 19th, 1911, acknowledged on the same day, and recorded on October 16th, 1911. This purports to assign three mortgages—(1) Hunkels, $3,000; (2) Bock, $2,400; (3) Murray, $3,000. The Murray mortgage having been previously paid off.

It is quite apparent from an examination of these three assignments of the manner in which the signatures were witnessed and the acknowledgments taken that the man who committed the frauds was no other than Crocker. By his manipulation of the nine-mortgage assignment, and keeping it off the record, he was able to reserve six mortgages (or five with the Murray mortgage left out) with which to carry on further fraudulent operations.

I am, therefore, constrained to hold that the complainants never lost title to the bond and mortgages in question and that

Dr. Dennis obtained no title thereto. The only argument that has occurred to me to point in the contrary direction lies in the fact that in some manner, and by some means which are absolutely unknown and unexplained, Crocker got into his possession the genuine signatures of the complainants and was thereby enabled to commit the forgery of which he is guilty. There being no evidence on this point, I do not think that under the circumstances I can assume or infer that Crocker came into possession of them either rightfully or wrongfully. It was held, by the court of errors and appeals in the case of *Heyder* v. *Building and Loan Association, 42 N. J. Eq. 403,* that where one gives to another the power to practice a fraud upon innocent parties, the court will not interfere for his protection at the instance of those who have been deceived and misled by such fraud. There the owner of a mortgage permitted the document to remain in the custody and under the control of the mortgagor, and thus the mortgagor was enabled to commit a fraud upon the mortgagee by canceling the mortgage unlawfully. The mortgagee could not have any relief against this fraud, for the reason that he contributed to it. That case, however, cannot apply to the facts now before the court, for the reason that it is not proved that the complainants had anything to do with putting Crocker into possession of the fourth sheet of the "nine-mortgage" assignment containing their genuine signatures. If there is any inference to be drawn from all the facts and circumstances, so far as we know them, it is that Crocker obtained this sheet unlawfully, and if he did obtain it unlawfully, the complainants cannot be affected thereby. This view of the case results in the restoration to the complainants of the mortgages in question and gives to them their original title thereto. It takes from Dr. Dennis any right to the mortgages still held by him and compels him to account for the proceeds of such of the mortgages as have been paid to him. Dr. Dennis cannot be charged with the Hunkels mortgage because he never got title to it, and while it appears of record to have been assigned by Dr. Dennis to one Hurlbut, Dr. Dennis testifies that his signature to the assignment is a forgery, and it is not denied; no

title therefore ever vested in Hurlbut, and for the same reason he could not transfer any title to the Liberty Trust Company.

The decree will provide for the restoration of that mortgage to the complainants if the pleadings are in proper shape for that purpose.

The Heineman mortgage, which was supposed to have been transferred to Dr. Dennis, and by him to Alice Macknet, will be disposed of by the decree upon the same principles.